Filed 12/8/14  P. v. Silva CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F066141 |
| Plaintiff and Respondent, | (Fresno Super. Ct. No. F11907044) |
| v. | |
| ANTHONY SILVA, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Galen N. Farris, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant/defendant Anthony Silva confronted his former friend, Jerry Manning, Jr. (Jerry Jr.), who was seated in his vehicle outside the Manning family's home and fired

multiple gunshots at him, wounding him twice. Jerry Jr. stumbled into his house and told his parents and brother that defendant shot him. Jerry Manning, Sr. (Jerry Sr.) went outside and defendant shot him multiple times. Defendant went into the house and attempted to fire a final shot at Jerry Jr.'s head, but he ran out of ammunition. He fled the scene, and Jerry Jr.'s younger brother saw him running away. Gabrielle Vang (Vang), defendant's former girlfriend, later revealed that he spoke to her a few hours later and said he did "something bad," he "got into it" with Jerry Jr., and he asked her to provide an alibi.

After a jury trial, defendant was convicted as charged of count I, attempted murder of Jerry Sr. (Pen. Code, §§ 664/187, subd. (a));[1] count II, attempted murder of Jerry Jr.; count III, malicious discharge of a firearm at an occupied vehicle (§ 246); and count IV, second degree robbery of Jerry Jr. (§ 211), with enhancements for personal discharge of a firearm causing great bodily injury to the victims (§ 12022.53, subd. (d)). Defendant was sentenced to an aggregate term of 50 years to life plus eleven years four months.

On appeal, defendant contends his defense attorney was prejudicially ineffective based on the manner in which he conducted the direct examination of defendant's trial testimony and his closing argument. He also contends the prosecutor committed prejudicial misconduct during rebuttal argument. He further argues there is insufficient evidence to support his convictions based on conflicting evidence of his identity as the perpetrator of the offenses.

We will order correction of the abstract of judgment and otherwise affirm defendant's convictions.

## FACTS

Defendant and Jerry Jr. attended Central High School together and were good friends. After high school, they continued to hang out at each other's homes and often

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

did things together. Jerry Jr.'s parents, Jerry Sr. and Lezette Manning, and his brothers Jerkobe and Jebril, also knew defendant.

In 2011, however, Jerry Jr. and defendant had a falling out because of an incident that occurred at a Denny's restaurant. Around the same time, they had a confrontation and physical fight at a gas station. Jerry Jr. got the best of defendant during the fight. Jerry Jr. offered to shake hands with defendant but he refused.[2]

**The Confrontation at the Mall**

In November 2011, on the day after Thanksgiving, Jerry Jr. was at Fashion Fair Mall in Fresno with his brother, Jerkobe, and a friend. Defendant was at the mall with Gabrielle Vang and some other friends. Vang knew Jerry Jr. from high school.

Defendant and Jerry Jr. saw each other several times that day. Vang testified she sensed the tension between Jerry Jr. and defendant, and they exchanged words. Jerry Jr. testified defendant got into his "space" and nudged him. Jerry pushed him back. Jerry Jr. believed defendant was trying to provoke him. In a loud voice, Jerry Jr. told Vang that she was "talking to somebody [who] ain't got no money. Talk to me." Jerry Jr. displayed a couple of $100 bills. Vang testified that Jerry Jr. showed disrespect toward defendant when he showed him the money. Defendant held up his own cash, and he appeared angry and embarrassed. Defendant told Jerry: " 'I want your head….' " Jerry Jr. believed defendant wanted to kill him. (RT 847) Vang testified defendant and Jerry Jr. started to move toward each other when a mall officer appeared and escorted them out.

---

[2] Jerry Jr., who was 22 years old at the time of trial, testified he had a felony juvenile adjudication in 2005. He was arrested by the Fresno Police Department on September 3, 2011, in an investigation which was still pending at the time of the shooting in this case. On May 25, 2012, Jerry Jr. reported to the police that someone shot at his vehicle while he was with his girlfriend. In the summer of 2012, his mother reported that someone drove by their house and fired a shot in the air.

**Defendant Robs and Shoots Jerry Jr.**

Around 5:00 p.m. on November 29, 2011, a few days after the mall encounter, Jerry Jr. drove up to the house where he lived with his parents. His brother Jebril was home on leave from the Marine Corps. His younger brother, Jerkobe, was not home from school yet.

Jerry Jr. testified he parked his Mercedes SUV at the front curb. He stayed in his vehicle for a few minutes and used his cell phone. His mother opened the front door and told him to come inside. He briefly went into the house and then he returned to his SUV to use his cell phone. It was dark outside.

As Jerry Jr. sat in the driver's seat of his SUV, defendant walked up to his vehicle. Jerry Jr. testified defendant was wearing a black sweater, he was not wearing a mask, and he could clearly see his face.

Defendant told Jerry Jr. through the closed window to open the driver's door. Defendant reached for the door handle with his left hand, and he pointed a gun at Jerry Jr. in his right hand. Jerry Jr. opened the door and remained seated in the driver's seat. Defendant stepped closer to him and ordered him to turn over his cell phone and wallet. Jerry complied. His wallet contained credit cards and $200 or $300 in cash.

Jerry Jr. testified defendant told him: " 'You're going to die tonight.' " Jerry Jr. covered up to protect himself, and defendant started shooting at him. Jerry Jr. was still sitting in the driver's seat. Defendant was standing within the open driver's door as he fired multiple shots. Jerry Jr. was shot in the shoulder. He tried to get out of the car and run away. Defendant kept shooting and Jerry Jr. was wounded in the stomach. Jerry Jr. believed defendant fired six shots at him.

**Jerry Jr. Gets into the House**

Jerry Sr., Lezette, and Jebril were inside the house. Jerry Sr. testified he heard "maybe five, six shots, pow, pow, pow, pow, pow" being fired in the front yard. Lezette heard the same sounds.

4.

At that time, Jerry Sr. was recovering from an injury. His leg was in a cast, and he was using crutches. Jerry Sr. testified he grabbed his crutches and hopped to the front door. Jerry Sr. and Lezette opened the door and saw Jerry Jr. in the front yard. He was leaning over and holding his stomach. He had been shot, and he was bleeding.

Jerry Jr. testified that after defendant fired the last shot at him, he ran to the front door, got into his house, and he lay down in the hallway. Jerry Jr. testified he told his mother that "they were shooting" at him. His mother asked who was shooting, and he testified he told his mother that "Anthony Silva was shooting at me." Jerry Jr. testified he told his mother the gunman's name just in case he "passed out or anything."

Jerry Sr. testified that Jerry Jr. told him: " 'He shot me in the stomach and in my arm, Dad. He shot me.' " Jerry Sr. asked, " 'Who shot you son? Who?' " Jerry Jr. replied, " 'Ant Silva.' "[3]

Jerry Jr.'s parents testified they recognized defendant's name because he had gone to school with their sons and used to visit their house.

Jebril testified he heard five or six gunshots and followed his father to the front door. Jebril saw Jerry Jr. as he came into the house. Jebril testified Jerry Jr. said "Anthony Silva" shot him.

Jerry Sr. testified he pulled Jerry Jr. into the house and closed the door. Jerry Jr. slumped against the wall. He raised his shirt and showed that he had been shot in the abdomen and shoulder. Lezette ran to the hallway to get towels for the wounds.

**Defendant Shoots Jerry Sr.**

Jerry Sr. testified he heard a car screeching away after Jerry Jr. was inside the house. He thought it could be the gunman. He left Jerry Jr. in the house and hopped outside because he wanted to get the car's description or license plate.

---

[3] Jerry Jr. and his family apparently referred to defendant Anthony Silva as "Ant."

5.

Jerry Sr. testified that as soon as he walked onto the front porch, defendant emerged from the flower bed, where he had been hiding behind a tree. Defendant was wearing a hoodie and a white mask, "like a panda face … with the black eyes, rings, or something like that around." Jerry Sr. testified he recognized defendant's body structure and build, and he could see defendant's hair in dreadlock braids under the hoodie.

Jerry Sr. testified he looked at defendant, and defendant raised his gun. Jerry Sr. raised his right arm at defendant and gestured not to shoot. Defendant fired and Jerry Sr. saw the muzzle-flash. Jerry Sr. was shot in the finger and left shoulder.

Jerry Sr. fell off his crutches to the porch. He tried to crawl into the house and managed to stand up. Jerry Sr. testified he again raised his hand and told defendant: "Wait. Wait a minute, man. Don't fire." Defendant shot Jerry Sr. again, and he fell down to his stomach. Jerry Sr. tried to get up, and defendant fired three shots into his back. Jerry Sr. again tried to get into the house, and defendant fired another shot which hit his clavicle.

Jerry Sr. testified that as defendant shot him, defendant leaned down and he could see a distinctive tattoo on defendant's neck which was not covered by the hood or mask. At trial, Jerry Sr. identified the tattoo on defendant's neck as the one he saw while he was being shot.

**Defendant Walks into the House**

After Jerry Sr. suffered the multiple gunshots, he fell face down on the porch. Defendant walked up to him, pointed the gun directly at his head, and fired another shot. Jerry Sr. moved and the bullet grazed his head. Jerry Sr. groaned and was heavily bleeding. Defendant stepped over Jerry Sr. and walked into the house. Jerry Sr. testified defendant was still wearing a mask.

Lezette testified she was walking toward the open front door with the towels for Jerry Jr. when she heard more gunshots. She saw the gunman shoot Jerry Sr. on the porch. Lezette testified the gunman was wearing a black hoodie over his head and a

6.

mask on his face.  The mask was white with black rings around the eyes, similar to the mask from the movie "Scream."

Lezette testified she saw Jerry Sr. fall down, and the gunman stood at the threshold of the front door.  The gunman fired another shot at Jerry Sr.'s head, stepped over his body, and walked into the house.  Lezette testified that the gunman looked up and their eyes met.  Lezette was frightened that he was going to "kill us all."

Lezette testified she recognized the masked gunman was defendant.  She knew defendant had long dreadlocks at the time, which she could see under his mask.  She also recognized his short stature, the "demeanor of his body" from their past acquaintance, and from their eye contact.

Jerry Sr. saw Lezette in the hallway and shouted for her to get away.  Lezette ran into the bathroom, locked the door, and lay down on the floor.

**Jebril Sees the Gunman**

Jebril testified he stayed in the front hallway with Jerry Jr. when his father went outside to look for the screeching car.  Jebril heard additional gunshots.  He looked through the open front door and saw the gunman shoot his father twice.  Jebril testified the gunman was wearing a black hooded sweatshirt, but the hood was down.  The gunman was also wearing a black and white beanie, with a mask rolled down to cover his face.  The mask's eyeholes were white and looked like a skull, panda, or clown face. Jebril saw the gunman's dreadlocks or braids from under the mask.

Jebril testified Jerry Jr. had already told him that defendant was the gunman. When Jebril saw the gunman, he recognized defendant by his body size.  "I could tell completely who it was.…  I've been knowing this guy for like seven years" because they attended middle and high school together, and defendant had been to their house several times.

## Jebril Moves Jerry Jr. into the Kitchen

As Jerry Sr. was being shot, Jebril and Jerry Jr. moved into the kitchen. They heard more gunshots. They also heard their father yelling and moaning. Jebril's initial reaction was to reach for his service weapon, which he did not have. Instead, Jebril left Jerry Jr. in the kitchen, ran to the garage, and grabbed a weapon which was stored there.

## Defendant Confronts Jerry Jr. in the Kitchen

Jerry Jr. testified he was lying on his back in the kitchen. He looked up and defendant suddenly appeared. Defendant was not wearing a mask. Defendant put the gun at Jerry Jr.'s head and said, " 'It's over.' " Defendant pulled the trigger, there was a click, and the gun did not fire. Jerry Jr. realized defendant was out of bullets. Defendant ran out of the house.

Jerry Sr. testified that as he was lying at the front door, he saw Jerry Jr. crawl into the kitchen. Jerry Sr. saw defendant walk into the kitchen, and he heard defendant say: "… I told you I was going to kill you." Jerry Sr. testified he recognized defendant's voice from their prior contacts. Jerry Sr. thought he heard gunshots from the kitchen, and then he saw defendant run out of the house.

Jebril returned from the garage with a weapon, but defendant had already left. Jebril not see defendant confront Jerry Jr. in the kitchen.

Jerry Sr. testified that during the entire confrontation, he recognized defendant's body structure, height, weight, and the way he walked. Jerry Sr. recognized defendant's voice when he threatened Jerry Jr. in the kitchen.

## Jerkobe Arrives Home

Jerkobe testified he had been at basketball practice and took the bus home. He got off the bus and was walking toward his house when he heard "pop, pop, pop, pop." He thought it sounded like gunshots but he did not realize something was happening at his house. As he got closer to home, he saw Jerry Jr.'s SUV parked in front. No one was

near the vehicle, but the driver's door was open and there were bullet holes in the window.

Jerkobe testified he ran toward his house. He saw two people running towards him. They "jump[ed] in the middle of the street," ran past him, and made disparaging racial curses about African-Americans. Based on the nature of the curses, Jerboke thought the men might have been Hispanic. At trial, Jerkobe testified one man was wearing a black jacket and kept his hand in his pocket as if he had a gun. This man seemed to be pulling a hood over his head. Jerkobe could see the man's hair hanging out of the hood, and his hair was in "dreads" or "twisties." The other man was wearing a white jacket and hoodie.

When Jerkobe arrived home, he found his father and brother had been shot. Jerkobe testified he asked Jerry Jr. what happened. Jerry Jr. replied: " 'Uh, Ant Silva shot me.' " At trial, Jerboke testified he knew defendant, but claimed he did not recognize defendant as one of the men running away from his house.

**The 911 Call**

At 5:24 p.m., Jebril called 911 and reported two people had been shot. The 911 operator mistakenly assumed it was a drive-by shooting and asked for the description of the car. Jebril responded, "[W]e don't know what car," and "I–I think I–I know who did it," and "[h]is name is … Anthony Silva."

The operator asked Jebril what happened. Jebril said: "He–he ran up to our house and shot my brother and my dad," and they needed an ambulance. When asked for more details, Jebril said "he came in and he had a hat on." Jebril said his father was shot in the head and three times in the back. His brother was shot in the arm and stomach.

**Statements at the House**

At approximately 5:30 p.m., Officers Warner and Fitzgerald responded to the victims' residence. Jerry Sr. was in the front hall and Jerry Jr. was in the living room.

9.

They were bleeding from numerous gunshot wounds. The officers rendered emergency aid until the paramedics arrived.

Officer Fitzgerald asked Jerry Sr. what happened, but he was not able to speak. Officer Warner asked Jerry Jr. who shot him. Jerry Jr. had difficulty breathing but he replied, " 'Anthony Silva.' " Jerry Jr. was unable to respond to additional questions.

Both victims were transported to the hospital, and their family remained at the house and spoke to the officers. The officers testified that either Jebril or Jerkobe said defendant was responsible because he had prior issues with Jerry Jr. Jebril testified he told officers "exactly what happened as I seen it." Jebril identified defendant as the gunman and said that "Anthony Silva did this." Lezette also spoke to Officer Fitzgerald at the house. She explained that after Jerry Jr. was shot, he told her that " 'Ant did this,' " and she believed he meant defendant.

**The Investigation at the Scene**

An examination of Jerry Jr.'s SUV revealed four bullet holes through the driver's door window and one bullet hole in the driver's door below the side mirror. There were five bullet holes in the driver's seat, a bullet strike on the driver's side of the vehicle, two bullet holes in the back seat, and a bullet hole through the rear passenger window.

There were 11 expended .380-caliber cartridge casings recovered at the scene. Six casings were on the ground near the driver's side of the SUV. Three more casings were on the front lawn, one casing was at the front door, and another casing was just inside the doorway. There was a bullet strike on the side of the front door and another strike on an exterior wall. There were bullet fragments in the hallway. All the expended casings were stamped as Winchester .380-caliber automatic cartridges.

Jerry Jr.'s wallet was found in a plastic bag in a trash can in the neighborhood. It still contained his identification but the cash was gone. The plastic bag also contained

10.

jeans and two white T-shirts. A black sweatshirt was also in the trash can; it did not have a hood.[4]

## The Witnesses' Statements at the Hospital

Detective Gebhardt interviewed Lezette, Jerbril, and Jerkobe at the hospital while they waited for the victims to be treated. Lezette testified she fully cooperated with the police and told Gebhardt that Jerry Jr. said "Ant Silva" was the gunman. Lezette said she was familiar with defendant because he was Jerry Jr.'s former friend. Lezette said defendant was wearing a hood over his head, a Halloween or "Scream" mask on his face, he was short, and he had long dreadlocks that she could see from below the mask.[5]

Jebril told Detective Gebhardt that after Jerry Jr. was shot, he said: "Ant Silva just shot me." Jebril said the gunman was wearing a black and white Halloween or skull mask, but he saw long dreadlocks beneath the mask. Jebril identified defendant as the gunman in a photographic lineup, and identified him at trial as the gunman.

Jerkobe told Detective Gebhardt he saw two men running from his house, and he recognized defendant was one of the men. Jerboke said defendant ran by him, made a disparaging racial remark, and said he had just shot someone. Defendant was wearing a black hooded sweatshirt, and had shoulder-length dreadlocks. Jerkobe said defendant was putting a black and white mask in his pocket as he ran away. Jerkobe said the second man was wearing a white, hooded sweatshirt. Jerkobe also told the police about the fight between defendant and Jerry Jr. at the mall. Later that night, Jerkobe identified defendant as the gunman from a photographic lineup.

---

[4] The wallet contained a mixture of DNA, and the DNA did not belong to defendant or Jerry Jr. There was no blood on the wallet or the clothing. A DNA analysis was not performed on the clothing.

[5] Later on the night of the shooting, Detective Gebhardt escorted Lezette back to the neighborhood because possible suspects had been detained in the area; defendant was not one of the suspects. He asked her to look at the suspects during an infield showup. Lezette did not identify anyone as the gunman.

**The Victims' Injuries**

Jerry Sr. was shot six times. He suffered bilateral shoulder blade fractures, a large contusion to his lungs, several broken ribs on the left posterior side, a puncture to the left lung, a bullet fragment lodged near a large blood vessel in his neck, and a superficial wound to his forehead. He did not have surgery for the gunshot wounds. He was left with three bullets lodged in his back and one in his neck. He suffered nerve damage in his left arm and continual back pain. He was in the hospital for nine or 10 days.

Jerry Jr. was shot in the shoulder and stomach. One of the bullets lodged near the left side of his heart. He also suffered a fractured rib and hip. The surgeons performed open heart and abdominal surgery to repair his internal injuries. He was in the hospital for two or three weeks.

**The Victims' Initial Statements at the Hospital**

Shortly after Jerry Sr. arrived at the hospital, Detective Gebhardt spoke to him in the trauma unit. Jerry Sr. said he believed defendant shot him, but he also said he was facing away from the gunman, he did not actually see defendant, and he was not able to identify him.

A couple of hours after the shooting, Officer Warner spoke to Jerry Sr. at the hospital and asked what happened. Jerry Sr. said he did not know who shot him, he did not provide a description, and he did not say he knew the gunman's identity. Jerry Sr. testified he did not tell the police that defendant was the gunman because he did not know if he would survive or if Jerry Jr. was dead, and he wanted revenge and to "take care of it myself."

On November 30, 2011, Detective Kazarian interviewed Jerry Sr. at the hospital. Jerry Sr. said Jerry Jr. identified defendant as the gunman: "He said his son said the person who shot him was Anthony Silva, and he said it with conviction. While saying this, I noticed his eyes teared up and I could see tears running down" his face. Jerry Sr. said he went outside when he heard screeching tires, and the gunman repeatedly shot him

12.

and walked into the house. Jerry Sr. said the gunman was wearing a Halloween mask, and he did not see his face. He did not mention a tattoo on the gunman's neck. He did not say that he recognized the gunman as defendant.

Detective Kazarian spoke to Lezette at the hospital on the same day. She said that Jerry Jr. told them that defendant shot him. Lezette told Kazarian about the incident between defendant and her son at the mall.

Also on November 30, 2011, Detective Kazarian briefly spoke to Jerry Jr. in the Intensive Care Unit and asked if he knew the gunman's identity. Jerry Jr. said the gunman was wearing a mask, and " 'I thought it was Silva, but I'm not sure.' " Kazarian asked Jerry Jr. if he recognized the gunman's voice, and he said not really. Kazarian believed Jerry Jr. was being evasive. He explained the seriousness of the situation and advised Jerry Jr. that his parents had identified the gunman. Kazarian again asked Jerry Jr. if he knew who shot him. Jerry Jr. nodded his head and said, " 'Ant Silva,' " and that he recognized his voice. Kazarian showed Jerry Jr. a photographic lineup with defendant's picture. Jerry Jr. refused to identify anyone.

At trial, Jerry Jr. testified he recognized defendant in the photographic lineup, but he did not tell the officer because he wanted "to take it in my own hands and basically get him myself. So I didn't want the law involved." Jerry Jr. testified he lied when he told the police the gunman was wearing a mask because he "really wanted to get" defendant himself, and he "didn't really want the laws involved. I was really angry, because my father was shot, and shot in the head, and just retaliation. I was ready to do that."

**The Victims Cooperate**

At some point during the victims' hospitalization, Jerry Sr. testified he changed his mind about taking revenge when he realized he had survived the traumatic experience. He was concerned Jerry Jr. could be arrested or killed if he did something. Jerry Sr. realized they were lucky to be alive and get a second chance. Jerry Sr. convinced Jerry

13.

Jr. that they should cooperate with the police. He told Jerry Jr. that they should call the detective, tell the truth, and just "clean it up."

Jerry Jr. testified his father convinced him to cooperate with the police because they were blessed to have survived. Jerry Jr. was also concerned he might never see his young son again if he took matters into his own hands.

On December 2, 2011, Detective Kazarian interviewed Jerry Jr. at the hospital. Jerry Jr. said he told his mother that defendant shot him. Jerry Jr. told Kazarian that he used to be friends with defendant, but they had a falling out. He told Kazarian about the fight with defendant at the gas station and the mall incident. Jerry Jr. identified defendant from a photographic lineup, but he refused to sign the lineup card. He told Kazarian that he wouldn't sign the card because he was afraid of being killed as a snitch.

On December 15, 2011, Jerry Jr. called Detective Kazarian from the hospital and said he wanted to clarify his statement. When they met at the hospital, Jerry Jr. gave a detailed account of the shooting: Defendant was the gunman, he was not wearing a mask when he initially appeared in the front yard, and he identified defendant to his parents. Jerry Jr. again identified defendant from the photographic lineup, and this time he signed the lineup. He explained that he previously wanted to handle the situation himself, but he realized he had a second chance, and he wanted defendant to be held accountable.

**Defendant's Activities After the Shooting**

Gabrielle Vang, defendant's former girlfriend, testified for the prosecution. They had been in a relationship for about two weeks before the shooting. Vang was present during the confrontation at the mall between defendant and Jerry Jr. She had also known Jerry Jr. in school. Vang testified their relationship ended shortly before the shooting because she discovered defendant was also in a relationship with Perris Jackson.

Vang testified that on the night of the shooting, defendant called her around 6:00 p.m. and said he wanted to meet her. They later met at her cousin's apartment. Vang testified defendant was shaken and crying. He told her: " 'I did something, but I can't

14.

tell you.' " About 15 minutes later, defendant and Vang left the apartment and went on an errand. Defendant gave her a $100 bill to buy liquor and cigarettes. Vang saw even more cash in defendant's pocket.

Vang and defendant returned to the apartment. Vang saw Facebook postings that Jerry Jr. was either seriously injured or dead. Vang was shocked and remembered the confrontation at the mall. When she told defendant about the postings, defendant said to turn off her cell phone.

Vang testified Perris Jackson arrived at the apartment. Vang again asked defendant what happened. Defendant said that he did "something bad," and the police would be looking for him. Defendant told Jackson and Vang that he "got into it" with Jerry Jr. He told Vang to tell the police he had been with her all day. Vang refused. Vang testified people later threatened and accused her of being involved in the shootings.

**The Cell Phone Photograph of the Gun**

On the evening of December 10, 2011, defendant was arrested at Jackson's house. After defendant was taken into custody, he called Jackson from jail and told her to get rid of a cell phone. The investigators listened to defendant's calls from jail, heard the exchange about the cell phone, and immediately obtained a search warrant for it. The officers contacted Jackson and recovered the cell phone from her possession.

The officers found two photographs on the cell phone which showed a .380-caliber semiautomatic handgun resting on the leg of an unknown person. The gun's slide was stamped "PA-63."

A firearms examiner testified the gun shown in the photographs was a "9 x 18 Makarov," which commonly used .380-caliber cartridges. The gun used to shoot the victims in this case was never recovered. However, the firearms examiner determined the 11 Winchester cartridges recovered from the scene had been fired from the same weapon. The cartridge walls were slightly swollen, which was consistent with being fired from a Makarov.

15.

## DEFENDANT'S TRIAL TESTIMONY

Defendant testified he did not shoot the victims and did not know who did it. Defendant testified that on November 29, 2011, the day of the shooting, he was angry with the woman who was the mother of his child because he learned she slept with his cousin. He posted his feelings on Facebook at 7:09 p.m., 8:10 p.m., and 4:58 a.m.[6] He received numerous responses from friends who called him a hypocrite because he had several girlfriends at the time. Defendant testified he had relationships with Gabrielle Vang, Perris Jackson, and another woman, and they did not know about each other.

Defendant testified he did not know Jerry Jr. had been shot until his cousin called him that night. His cousin told him about the shooting, that Jerry Jr. was at the hospital, and that Jerry Jr. thought defendant did it. Defendant testified he was surprised Jerry Jr. would think he did it, and they used to be close friends. Defendant also testified they had disagreements at the restaurant, gas station and the mall. Defendant testified they pushed each other at the mall and flashed their cash at each other. Defendant tried to shake Jerry Jr.'s hand, but he refused. Defendant no longer considered Jerry Jr. his friend. However, defendant denied he threatened Jerry Jr., showed anger toward him, or said he wanted his "head" during the mall incident.

Defendant testified that shortly after hearing about the shooting, he received threatening telephone calls from unidentified people using blocked numbers. They accused him of shooting the victims and threatened to kill defendant, his family, and his girlfriends.

Defendant took the threats seriously. He called Vang and Jackson and asked them to meet him. He did not tell them the reason. Vang and Jackson arrived separately at his apartment. Vang did not ask why Jackson was there. Jackson was crying when she

---

[6] On cross-examination, defendant conceded he used his cell phone to post on Facebook, and there were no posts around 5:00 p.m., when the victims were shot.

16.

arrived. Defendant told Vang about the threats, and she acted like she did not care and kept posting on Facebook. Defendant told her to turn off her cell phone and listen to what he was telling her about the threats. Defendant testified he never told Vang that he shot Jerry Jr., that he did something bad, or asked her for an alibi. Defendant testified he comforted Jackson, who was still crying, and Vang left the apartment.

Defendant testified he spent the night with Jackson. Vang returned the next morning and found Jackson was still there. Vang discovered his relationship with Jackson, and that Jackson was pregnant with defendant's child. Defendant testified Vang was angry and she cursed him. Defendant testified Vang had no reason to dislike him until she found out about his relationship with Jackson.

Defendant testified he went to the police department with his mother on December 1, 2011, because he saw his name on "Crime Stoppers," indicating he was responsible for shooting the victims. He wanted to clear his name. He spoke to a female officer at the front desk and showed his identification. The officer checked the computer and said he just had a misdemeanor warrant from Santa Clara County, and he could call and clear it up. Defendant asked to speak to someone about the shooting, explained his name was on the television, and he was receiving threats. His mother insisted that he needed to talk to someone to clear up the accusations.[7] The officer said there were no outstanding arrest warrants and there was no reason to talk to another officer.

Defendant testified that at the time of the shooting, he sold marijuana, Ecstacy pills, and liquor without a license. He knew the activities were illegal. Jackson helped him with sales. Defendant testified Jackson's cell phone contained photographs of his inventory of drugs and alcohol, and his sales activities with other people. Jackson e-

---

[7] On cross-examination, defendant testified he called Jackson from jail after he was arrested and admitted Jackson passed along a message from his mother not to say anything.

17.

mailed the pictures to her friends to "promote" his drug and alcohol sales. Jackson's cell phone also had photographs of defendant and Jackson having sex. Defendant looked through the cell phone before he was arrested, and he never saw any photographs of a firearm. He testified he was not the person depicted in the photograph who was holding the firearm.

Defendant testified he was arrested at his cousin's apartment. Jackson was there when he was arrested. The police called Jackson's cell phone and told him to walk out of the apartment. Defendant testified it was "no secret" he lived at that apartment, and the utility bills were in his name. His hair was in shoulder length dreadlocks when he was arrested, and it had been in the same style for several weeks. Defendant gave his narcotics to Jackson before he was arrested so the police would not find the drugs.

Defendant testified he agreed to speak to Detective Castillo after he was arrested because he wanted to clear his name. He told Castillo he went to the police department and tried to clear his name. Defendant also said that he thought about cutting his hair so he could visit Jerry Jr. at the hospital. He decided against it because of the threats, and he did not want the police to think he cut his hair to avoid being identified. The officer told him he was going to be placed in custody. Defendant was crying and confused and felt there was no justice.

Defendant testified he called Jackson from jail and told her he was being held. He also told her to get rid of the cell phone because he thought the police had tapped it, and he knew it had the photographs of his drug and liquor inventory. Defendant claimed he never saw the cell phone photograph of the gun before he was arrested.

### *Cross-Examination*

On cross-examination, the prosecutor focused on defendant's prior friendship with Jerry Jr. and his brothers, the conflicts between them at the restaurant, gas station, and the mall, and whether he threatened Jerry Jr. at the mall. He also impeached defendant with

18.

his prior inconsistent statements from his postarrest interview to Detective Castillo. The prosecutor did not ask defendant about his narcotics sales.

Defendant conceded he was close friends with Jebril, they ate lunch together every day at school, and Jebril used to visit his house every day after school. The prosecutor asked defendant whether Jebril identified him as the gunman. Defendant replied that Jebril said the gunman wore a mask.

Defendant admitted he told Detective Castillo he was with his cousin all day. Defendant testified that he told Castillo he was thinking about cutting his hair to avoid people who were threatening him so he wouldn't get killed. He did not mean that he was going to visit Jerry Jr. at the hospital. He was scared to visit him because of the threats.

## REBUTTAL

Detective Kazarian testified he learned from Perris Jackson that defendant and his mother went to the police department and tried to talk to an officer about the shooting. Kazarian testified he could not find any record of defendant speaking to a duty officer or records clerk in the lobby of the police department between November 29 and December 2, 2011. He was unable to obtain the lobby's surveillance camera footage because it was taped over when he learned about defendant's alleged visit.

Detective Castillo testified he conducted a tape-recorded interview with defendant after he was arrested. Defendant said he knew his name was being "tossed around" in the shooting. Defendant said he was "homeless" and moved from place to place. He had smoked marijuana earlier in the day. Castillo did not ask defendant any questions about narcotics sales.

Defendant said he knew the Manning family, he used to be good friends with Jerry Jr., and they had a falling out at the mall. Defendant said Jerry Jr. threatened to beat him up. Defendant became emotional when he talked about his disagreement with Jerry Jr., and said "at least a dozen times" that he did not like Jerry Jr. anymore.

19.

Detective Castillo testified he asked defendant if he was "capable" of shooting someone. Defendant said he didn't see himself shooting anyone, and " 'I've got other things to do, you know.' " Defendant also said, " 'I mean, I could shoot somebody,' " and " 'Anybody's capable of shooting anybody I believe.' " Defendant added, " 'Yeah, anybody can shoot somebody, but that is not my type of life.' " Defendant said he thought about joining the military.

Detective Castillo asked defendant what he was doing on the day of the shooting. Defendant said he was with his cousin at his apartment. He saw Jackson and Vang in the evening. He left around 7:00 p.m. or 8:00 p.m. with Vang to purchase liquor. He described Vang as his girlfriend. Defendant said he had been thinking about cutting his long dreadlocks because he wanted to visit Jerry Jr. in the hospital.

Detective Castillo told defendant he did not believe his story. Defendant replied that he was not involved in the shooting. Castillo told defendant that "all kinds of people saw him at the scene." Defendant said: " 'I believe no one saw me. No one saw me,' " and people were making it up.

## DISCUSSION

### I.     Ineffective Assistance

Defendant contends his defense attorney was prejudicially ineffective based on the manner he questioned defendant before the jury. Defendant argues that defense counsel treated him as a hostile witness, asked questions which placed him in a bad light, and admitted in closing argument he "sabotaged" defendant's case when he conducted direct examination. Defendant cites to numerous sequences in his trial testimony in support of this argument.

As we will explain, our review of these sequences in context of the entirety of defendant's testimony refutes defendant's contentions. Defense counsel's apparent tactical decisions when he conducted direct examination were not ineffective or prejudicial in light of the entire record.

20.

### A. *Standard of Review*

We begin with the well settled standard to review defendant's contentions. "In order to demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Second, he must show prejudice flowing from counsel's performance or lack thereof. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 214–215.)

" 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' [Citation.] '[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' [citation]. 'Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.' [Citation.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 925–926; *People v. Hinton* (2006) 37 Cal.4th 839, 876.) The test "is not solely one of outcome determination. Instead, the question is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.' [Citation.]" (*In re Harris* (1993) 5 Cal.4th 813, 833.)

"In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions. [Citations.]" (*People v. Weaver, supra*, 26 Cal.4th at p. 926.)

## B. Defendant's Narrative Responses

Before we address defendant's claims of ineffective assistance, we begin with defense counsel's initial questions to defendant about his prior friendship and later disagreements with Jerry Jr., how he learned about the shooting, and the anonymous threats that were made to Gabrielle Vang, Perris Jackson, and himself after the shooting.

In response to these questions, defendant responded with long, narrative answers which went beyond the questions and were not responsive. Defense counsel tried to keep defendant focused to respond to the question that was asked. For example, when defense counsel asked defendant about the threats to Vang, counsel prefaced his question as follows:

> "Anthony, in order for us to have a conversation that [the reporter] can write down, try to listen specifically to the question I'm asking you and try to answer the question that I'm [asking]. I know you want to get up and tell your story, but we have to do it in a certain way. So I'm going to ask you a question, listen to the question specifically and try to answer it that way. I will make follow-up questions if we need to."

## C. Defendant and Jackson

Defendant's first claim of ineffective assistance is based on a sequence which followed defense counsel's statement quoted above. Counsel asked defendant about the threatening telephone calls and his decision to call Gabrielle Vang and Perris Jackson to warn them about the threats. Defendant continued to give long, narrative, and rambling answers to the questions.

Defense counsel asked defendant if Jackson already knew about the threats before she arrived at his apartment. Defendant responded with another long, narrative answer, and testified Jackson was crying when she arrived, he asked her why she was crying, and she said people called and said they were going to kill her because she had something to do with shooting Jerry Jr.

> "[DEFENSE COUNSEL:] So [Jackson] came to your house already knowing about Jerry?

22.

"A   Not when I first saw her, called her. When I first told her, she did not know.

"Q   *Let me stop you there. Listen to the question.* When she came to your house, when she arrived at your house, she already had the idea in her head about threats, correct?

"A   Yes." (Italics added.)

The prosecutor moved to strike defendant's answer as speculation, and the court ordered the answer stricken. Defense counsel asked defendant about his conversation with Jackson. The prosecutor objected to the question as hearsay and the court agreed. Defense counsel continued with direct examination and asked about whether Vang knew why Jackson was also there.

### 1. **Analysis**

Defendant points to the italicized portion of defense counsel's question and contends his "word choice was belligerent" because counsel told defendant: "*Let me stop you there. Listen to the question.*" In context, however, defense counsel made these two statements to keep defendant focused on the question being asked and avoid the long, rambling, narrative and sometimes unresponsive answers he had been giving. Counsel was not acting belligerently to his own client.

As defendant's testimony continued, defense counsel was compelled to repeatedly keep defendant focused on answering the questions being asked, instead of rambling on about irrelevant or damaging matters. Defendant has not referenced these other exchanges as constituting ineffective assistance, but they place the entirety of defendant's testimony in context. We have already quoted defense counsel's gentle admonition to defendant above. Later in the direct examination, defense counsel asked defendant about his visit to the police department to clear his name. When defendant described the visit, he again lapsed into an unresponsive narrative, and defense counsel said: "Let me stop you" and "Listen to the questions. Some of them are yes or no." Counsel continued: "We have to make sure it is clear. What I'm asking is a yes or no. You can answer yes

23.

or no.  I can ask you to explain, but we will have to go further and take that step back.  Okay?"  Defendant said he understood, and the questioning continued.  When defense counsel asked about his arrest and telephone call to Jackson from jail, defendant again lapsed into narrative responses, which included irrelevant facts, and counsel repeatedly told defendant to "stop" and answer the question.

Defense counsel was not ineffective because of his numerous attempts to keep defendant focused on answering questions and not lapsing into irrelevant or even damaging narrative responses.

### D.  *Defendant Testimony About Vang*

Defendant's next claim of ineffective assistance occurred immediately after the above sequence cited by defendant.  Defense counsel continued to ask about his meeting with Vang and Jackson.  As explained in the factual statement, Vang had already testified for the prosecution that she left the apartment with defendant to buy liquor and cigarettes.  Defense counsel was also aware that during his postarrest interview, defendant told Detective Castillo he left the apartment with Vang around 7:00 p.m. or 8:00 p.m. to purchase liquor.  He described Vang as his girlfriend.

During his testimony, defendant testified both women came to his apartment, he hugged and comforted Jackson because she was crying, he showed Jackson more attention than Vang, and Vang left the apartment.

"[DEFENSE COUNSEL:]          Did you go with Gabby [Vang] to get liquor?

"A     Uh, no.

"Q     Gabby said that you went and did that; isn't that correct?

"A     Yes.

"Q     *So which is it, Anthony?  I don't need you looking at the District Attorney at this time.  Look at my questions, okay?  I'm going to ask you again, did you leave that house with Gabby that night*?

24.

"A     No.  Not that I remember.

"Q     Anthony at this time …

"A     No.

"Q     –you're getting all of these threats, what is your feelings, what were our feelings going on at that time?

"A     I was – man, my feelings was all over the place at that time.  I'm feeling – I'm having mixed feelings with my baby's mother.  And I'm having feelings like people – my family is being threatened, you know, about being killed.  So I'm like – I'm down.  I was in the blue already that day, and then getting these phone calls about, you know, shooting somebody, and I didn't know if he was dead or not.  So I was just – I was – man, emotionally, I was everywhere.  I don't think I cried.  But it was probably on my face that I wanted to cry, you know, like damn.  Like, I was down.  I was real down, like.

"Q     Do you remember speaking to Officer Castillo on December 10th when you were arrested?

"A     Yes.

"Q     Did you tell Officer Castillo that you may have left that night with Gabby somewhere?

"A     Yes.

"Q     *So which is it Anthony, did you or did you not leave that night?*

"A     Well, it wasn't really the night.  It was – it was probably after 12:00.…  Yes, I did leave that night and went to Gabby's house, her grandma's house.  And we had got, you know, some weed.  She was – she was my connection."  (Italics added.)

### 1. Analysis

Defendant cites to the italicized portion of this sequence and again argues counsel's choice of words was "belligerent."  Given the nature of the record, however, defense counsel was apparently trying to keep defendant focused on the question being asked and avoid inconsistent testimony about his activities with Vang.  While counsel may have briefly displayed frustration with defendant's responses, he never sought to

undermine defendant's story and, as we will explain below, used his closing argument to explain this point to the jury.

It is important to note that on appeal, defendant has not argued that he did not want to testify at trial or that defense counsel forced him to testify. It is also important to note that the record strongly implies that defendant may have surprised defense counsel with some of his responses. Defense counsel repeatedly tried to keep defendant focused on the questions being asked, which were consistent with his defense theory that he was not the gunman and Vang testified against him because she was angry about his relationship with Jackson. Defense counsel's efforts to assist his client were not belligerent or ineffective.

### E. Defendant's Testimony About Vang and Jackson

Defendant next cites to defense counsel's questions about when Vang discovered his relationship with Jackson. Defendant testified he spent the night with Jackson. Vang returned the next morning and discovered Jackson was still there.

> "[DEFENSE COUNSEL:] And can you describe what happened when Gabby [Vang] arrived and Perris [Jackson] was still there?
>
> "A    Well, the next [day], me and Perris was asleep in the room and then I hear a knock on the door. I get up. I'm like, I'm going to check who it is. It was Gabby…. So I opened the door. And my natural reaction was to just let her in …. And that's when she found out that I was going out with Perris that day.
>
> "Q    What else did she find out that day about Perris?
>
> "A    That Perris was pregnant?
>
> "Q    By?
>
> "A    By me.
>
> "Q    *What was Gabby's reaction to that?*

"A      *She was pissed. Like she first walked out the house and I walked after her. And then she was just telling me, like, fuck me and all that. And I played her and stuff.*

"Q      *You did, right?*

"A      *Yeah, I did. I did.*"  (Italics added.)

### 1. Analysis

Defendant cites to defense counsel's italicized questions, and argues counsel was ineffective because he "chose to emphasize" defendant's failure to be honest with Vang, and that he had "played her." Defendant notes Vang had already testified about her discovery of defendant's relationship with Jackson. Defendant argues counsel painted him in the "most negative possible light" by asking about Vang's reaction to Jackson's pregnancy, which again raised this issue and further undermined his credibility.

The defense theory of the case was that Jerry Jr. falsely implicated defendant as the gunman because he was angry about their falling out, and the rest of his family simply repeated what Jerry Jr. told them. One of the most important prosecution witnesses, however, was Vang, who described defendant's activities just a few hours after the shooting, and his inculpatory statements and activities. Vang testified he was shaken and crying, that he said he had done something, but he could not tell her, that he had cash at the liquor store, and his reaction to Vang's discovery that Jerry Jr. had been shot. Even more damaging was Vang's testimony that defendant said he did something bad, the police would be looking for him, he "got into it" with Jerry Jr., and he asked her for an alibi.

In light of Vang's extremely damaging testimony against defendant, and defendant's testimony that he never made these statements to Vang, defense counsel was faced with having to explain why Vang would purportedly lie and effectively claim defendant admitted he shot Jerry Jr. The defense explanation was that Vang was angry about defendant's business and personal relationship with Jackson: Jackson helped with

27.

his illicit sales activities, they were in an intimate relationship, and she was pregnant with defendant's child. Defense counsel relied on these facts to create the motive for Vang to lie about defendant's alleged inculpatory statements.

Defendant concedes it was advantageous for the jury to hear Vang's direct examination testimony about her reaction to learning about defendant's relationship with Jackson, and that Vang's own testimony explained her motive to allegedly lie about him. However, defendant argues there was no tactical reason to ask defendant to repeat the story. Defendant argues the exchange undermined his credibility since he admitted that he lied to Vang and raised the inference he was lying to the jury. Defendant argues defense counsel's questions were more appropriate for the district attorney and not his own attorney.

To the contrary, the defense could not simply rely on Vang's prosecution testimony to explain her motives in this case, particularly since the rest of Vang's testimony was so harmful to the defense. Defendant's testimony about the uncomfortable moment when Vang learned about Jackson, and his admission that he had played her, may not have placed him in the best light, but supported the defense theory about why Vang would essentially accuse defendant of being the gunman in two attempted murders. Defense counsel may have reasonably concluded the potential benefit from defendant's vivid description of Vang's reaction, and the importance of undermining her prosecution testimony, outweighed any negative impact from defendant's admissions about his personal life.

Moreover, defendant had already testified he had multiple girlfriends and described his various Facebook posts on the day of the shooting, when he vented his anger about another former girlfriend having an affair with his cousin and his own friends accused him of hypocrisy. Defendant has not cited to his testimony on these points as examples of defense counsel's alleged ineffectiveness.

28.

Defense counsel's decision to ask defendant about Vang's reaction was not ineffective and was an appropriate tactical decision under the circumstances.

### F.  Defendant's Drug Sales

Defendant's next claim of ineffective assistance is based on defense counsel's questions about his illegal drug and alcohol sales.  As explained above, defendant testified that he sold drugs and liquor, he knew the activities were illegal, Jackson helped him with his sales activities, and the cell phone contained photographs of his inventory which he and Jackson used to further the sales.

After defendant testified about Vang's anger upon discovering his relationship with Jackson, the following exchange occurred.

> "Q     Okay.  Anthony, we have 12 jurors who are looking at you as you speak and you expect them to believe you have to explain to them that you were selling Ecstasy, marijuana, and weed?
>
> "THE COURT:     Counsel, I'm sorry, what is the question?
>
> "[DEFENSE COUNSEL]:  He expects the jurors to believe his testimony, knowing he has explained to them that he was a criminal at the time.
>
> "[DEFENDANT]:   I didn't do this.  I didn't do the crime, shooting Jerry, Jerry Manning Jr. and Sr.  I didn't do it.  So like me selling Ecstasy and weed, you know, it's like it is on a whole other scale to me.  This is attempted murder.  This is killing a friend.  This ain't killing like – I wouldn't kill anybody, period.  But this is killing a friend.  But I think about that.  I have a conscience.  You know, I'm not no lunatic.  I'm not no crazy person like the D.A. is trying to make me seem.  I'm not no …."

The court interrupted defendant and asked the attorneys to approach.  The court held a brief, unreported conference in the hallway.  The court resumed testimony in front of the jury and stated it was going to strike defendant's answer as unresponsive to the question.  The court directed the reporter to read defense counsel's last question and directed defendant to answer yes or no.

> "[DEFENDANT]:   Yes.

"THE COURT: [Defense counsel], you may elaborate if you wish, or clarify your question.

"[DEFENSE COUNSEL]: You do agree that on November 29th around that time, *you were committing criminal acts*, such as selling Ecstasy, correct?

"A     Yes.

"Q     And selling marijuana?

"A     Correct.

"Q     And selling alcohol without a license?

"A     Correct.

"Q     *And you agree or you knew at the time that these were illegal things, correct?*

"A     Yes." (Italics added.)

### 1. **Analysis**

Defendant argues defense counsel was prejudicially ineffective when he asked the questions italicized above, about his illegal drug and alcohol sales. Defendant argues these questions were not designed "to influence jurors favorably" toward him since counsel called him a criminal, enumerated each criminal act he committed when he sold drugs and liquor, and these questions would have been inadmissible under Evidence Code section 1101.

As explained above, the prosecution's case against defendant was based on the eyewitness identifications from the victims and their family and Vang's testimony about defendant's inculpatory statements. In addition, the prosecution strongly relied on the expert testimony about the semiautomatic firearm that was depicted on the cell phone, the type of cartridges found at the scene, that all the cartridges were fired from the same weapon, and the cartridges had distinctive characteristics consistent with being fired from the type of gun shown in the cell phone photograph.

30.

The weapon used in this case was never found, but the expert testimony on these points was extremely damaging to the defense and tied the expended cartridges to the weapon depicted on Jackson's cell phone. It was even more damaging when the prosecution introduced evidence of defendant's postarrest telephone call to Jackson from the jail, when he told her to get rid of the cell phone. The prosecution raised the obvious inference that defendant made this statement because he knew the cell phone contained the photograph of the weapon.

Given this background, defense counsel's tactical decision to ask defendant about his illegal drug and alcohol sales was not unreasonable because it provided the only explanation about why he told Jackson to get rid of the cell phone after he was arrested – he was afraid the police would see the pictures of his drug and alcohol inventory and learn about his sales activities. Defendant further testified he was not the person holding the gun, and he never saw that photograph on Jackson's cell phone before he was arrested.

Defense counsel was obviously aware that defendant's explanation also constituted an admission of criminal activities. Counsel sought to blunt the impact of defendant's admissions by asking defendant to explain to the jury that while he may have sold drugs, he could not have tried to kill someone, particularly in the manner claimed by the prosecution. Again, defense counsel may have decided the potential benefit provided by explaining why defendant wanted Jackson to get rid of the cell phone outweighed the negative impact of hearing about defendant's drug activities, and that it was far less serious for the jury to learn about defendant's drug sales than to believe he was telling his girlfriend to get rid of evidence about the gun used in the attempted murders. Defense

counsel's tactical decisions were not unreasonable or ineffective in light of the extremely strong evidence against defendant.[8]

### G. *Closing Argument*

Defendant's final claim of ineffective assistance is based on a limited portion of defense counsel's closing argument. Before addressing his contentions, however, we must review certain portions of defense counsel's closing argument, which preceded the section relied on by defendant.

Defense counsel used closing argument to assert the entire case was about the identification of the gunman, and argued Jerry Jr. influenced all the other witnesses when he stumbled into the house and either falsely claimed defendant shot him, or later decided in the hospital that defendant did it. Counsel argued Vang lied when she testified about defendant's inculpatory statements because she was angry about defendant's relationship with Jackson, and she was frightened about the threats she received for allegedly being involved in the shooting.

Defense counsel then turned to defendant's testimony:

"Remember, Anthony has a right to not testify, or he can choose to testify. I, as his attorney, cannot make that decision for him. I can't make him testify and I can't make him not testify. That's his decision. That's his decision. That's his decision alone. We look at people afterwards. How do they react afterwards? How do they act after a certain incident to see if they're guilty? Are they showing signs of guilt? Are they reacting in a guilty way? Well, apparently everyone has lost sight of all the things and all the effort that Anthony tried to take to clear his name."

Defense counsel reviewed defendant's testimony about his attempt to speak to an officer at the police department. Counsel argued the police jumped to the conclusion that

---

[8] In making his appellate argument that defense counsel was prejudicially ineffective for introducing evidence about his drug sales, defendant concedes he had every reason to have Jackson destroy the cell phone since it depicted the illegal drugs and alcohol he was selling.

32.

defendant was the suspect because of the statements from the victims and their family. Defense counsel argued the officers never obtained Jerry Jr.'s cell phone records to find out who he was texting just before the shooting. They never tried to determine whether the shooting had anything to do with the pending case against Jerry Jr., did not investigate why Jerry Jr. kept changing his story about the gunman's mask, and failed to further investigate the suspects who were detained the night of the shooting just because Lezette did not identify them.

Defendant's claim of ineffective assistance is based on the following section of counsel's closing argument:

> "Well, [the prosecutor] explains to you that you are not – you can consider Anthony Silva's testimony, but you shouldn't believe it. Why, because he is being charged with a crime? Why, because you should be prejudiced by him because he decided to speak? Why? Because, of course he would lie, he would lie to save himself. Everybody would lie to save themselves. Well, if that is the concept in our system, then we would never have the opportunity to defend ourselves. If a coworker tells you, I accused you of doing X, Y and Z, and you have no opportunity to defend – because of course you would lie about doing that. And your boss says to you, sorry, they accused you, so whatever you say, not going to believe it. You have every reason to lie.

> "Is it unreasonable what Anthony says? Anthony gave you a lot of information. I'm sure a lot of information that he didn't want to give you. I was frustrated with Anthony yesterday. *I was frustrated because this young man is trying to explain to you what happened, but he was not following the confines of the question and answer, the very dry system that we have. And that is my fault. I apologize for that. And I fell into that too. I didn't even allow him to tell his story. And I sabotaged his own testimony.*

> "But what Anthony tells you is, yes, he said get rid of the phone, yes, he said there are photos on the phone. He never says in the [jail] call what the photos are. In the [jail] call, you can hear the operator say, 'This call will be recorded.' He had to have heard that. But he didn't care, because he wasn't saying, get rid of something which deals with this case. Remember where he came from. He came from an investigator, an interrogation room where he thought he was giving a statement, but in fact

33.

they were looking for a confession. … He could not believe he gets arrested December 10th. He does not skip town. He does not change his appearance. He is here. He is not hiding. He didn't resist. He didn't have a weapon. They didn't find anything that they could use. He was cooperating at all times with the officers…." (Italics added.)

Defense counsel argued defendant told Jackson to get rid of the cell phone because he knew it had photographs of the illegal liquor and narcotics he was selling.

Defense counsel conceded defendant had his own problems, and admitted he cheated on his girlfriends and he sold drugs. These were "reasons to not like him, but that does not necessarily mean his story is incorrect."

### 1. **Analysis**

Defendant cites to the italicized portion of defense counsel's closing argument, quoted above, and contends counsel was ineffective for telling the jury that he had "sabotaged" defendant's case. Defendant concedes counsel might have tried to "undo the harm he [had] already done to his client's case." However, defendant asserts counsel's closing argument amounted to an argument against defendant, and invited the jury to find defendant was not credible.

As we have already explained, defense counsel was faced with the daunting task of addressing the eyewitness identifications of a gunman who shot the two victims at point blank range, confronted the witnesses face to face, and was someone well known to them; Vang's testimony about his inculpatory admissions; the distinctive gun depicted on the cell phone, which was consistent with firing the expended cartridges; and defendant's postarrest directive for Jackson to get rid of the cell phone. In order to do so, defense counsel was faced with introducing evidence which did not place defendant in the best light, but which explained the prosecution's evidence: Vang lied about him because she was angry that defendant played her, and Jackson was pregnant with his child; Jackson needed to get rid of the cell phone because it had photographs of defendant's drug

34.

inventory; and defendant may have sold drugs, but that was different from trying to kill two people in the manner described by the prosecution's evidence.

Defense counsel also had to deal with defendant's repeated failures to answer questions that were being asked and his frustration when defendant repeatedly ignored his admonitions to answer yes or no instead of giving rambling responses. Counsel was obviously trying to prevent defendant from going beyond the scope of the question and giving a response that was inconsistent or undermined the defense theory.

In light of the entirety of the record, defense counsel's closing argument sought to explain to the jury his momentary frustration with defendant's rambling answers and why he interrupted his responses. More importantly, defense counsel asked the jury to consider the reasons for Vang's lies and defendant's admonition to get rid of the cell phone, and realize that his story was consistent with the evidence. Whether a tactic works or backfires is not the question, and a failed trial tactic is not necessarily an irrational one. Defense counsel's tactical decisions were reasonable under the circumstances and were not ineffective.

### H. Prejudice

While we have concluded that defense counsel's tactical decisions were not ineffective, we will address defendant's final contention that counsel's decisions were prejudicial and a more favorable result would have occurred in the absence of counsel's strategic mistakes and "sabotaging of his defense."

Defendant argues counsel's trial strategy was prejudicial because the actual evidence which connected defendant to the shootings was "a tenuous chain that began and ended with Jerry Jr.'s belief [defendant] had tried to kill him," Jerry Jr.'s family identified defendant because they "fed off" his initial false claim that defendant was the gunman, and Jerry Jr. was predisposed to believe he was the gunman because of their prior disagreements "regardless of the truth." Defendant also contends Vang's testimony

35.

was suspect because of her anger about his affair with Jackson and the threats she received after the shooting.

Defendant further argues the cell phone photograph of the gun did not connect him to the shootings because the gunman was not identified, the picture was unreliable, and the DNA evidence was also inconclusive.

As we have explained, defense counsel had to address the eyewitness identifications, Vang's testimony, the cell phone photograph of the distinctive gun, and the physical evidence which connected the expended cartridges to that type of weapon. The witnesses testified the gunman was not a stranger. They had long been acquainted with him, and were familiar with his body structure, mannerisms, and voice. The witnesses testified Jerry Jr. immediately said defendant was the gunman as he stumbled into the house after being shot. Jerry Sr. testified he recognized defendant's voice when he went into the kitchen and confronted Jerry Jr. Jebril and Jerkobe also testified they recognized defendant from their prior contacts.

Vang's testimony was extremely damaging. She knew about the confrontation between defendant and Jerry Jr. and described his inculpatory actions and statements in the hours immediately after the shooting. The cell phone photograph of the distinctive semiautomatic gun was also damaging to the defense, particularly since the expended cartridges were consistent with being fired from that type of weapon.

Defense counsel's tactical decisions were not ineffective or prejudicial, and it is not reasonably probable that the result of the proceeding would have been different if counsel had not made these strategic decisions.

## II. Prosecutorial Misconduct – Alleged Accusation of Fabricating the Defense

Defendant contends the prosecutor committed prejudicial misconduct in rebuttal argument because he allegedly accused defendant and his attorney of fabricating the defense. Defendant objected to this section of rebuttal argument, and the court overruled

the objection.  Defendant argues the court erroneously overruled his objections, and the rebuttal argument was prejudicial and requires reversal.

As we will explain, the prosecutor's argument raised an inference based on the admissible evidence in this case, and did not constitute misconduct.

### A.  Prosecutorial Misconduct

We again turn to the well settled law in this area.  "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.'  [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'  [Citation.]  A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'  [Citations.]"  (*People v. Cole* (2004) 33 Cal.4th 1158, 1202.)

" 'It is settled that a prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.  [Citations.]' " (*People v. Wharton* (1991) 53 Cal.3d 522, 567–568; *People v. Stanley* (2006) 39 Cal.4th 913, 951–952.)

"To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.  [Citation.]"  (*People v. Price* (1991) 1 Cal.4th 324, 447; *People v. Silva* (2001) 25 Cal.4th 345, 373.)

### B.  Rebuttal Argument

Defendant contends the prosecutor committed misconduct in the following italicized portion of his rebuttal argument.  The prosecutor argued:

"Consider this, of all the witnesses that testified, including the defendant, who had the opportunity – and let me refer just to civilians. The Mannings and Ms. Vang. Who had an opportunity to review the police reports? *Who had the opportunity to take in the preliminary hearing transcript? Who was present in the audience when all the witnesses were testifying? Who had the opportunity to fine-tune his or her testimony based on what everyone said in the past, said here in court? One person. The defendant.* Ms. Vang, Jerry Manning, Sr., Jerry Manning, Jr., Lezette, Jebril, Jerkobe –" (Italics added.)

Defense counsel objected and asserted the argument violated defendant's Sixth Amendment rights. The court overruled the objection.

### C. Accusations of Fabricating the Defense

Defendant contends the prosecutor committed misconduct because he improperly suggested defendant fabricated his defense and trial testimony. Defendant argues the prosecutor cast " 'uncalled for aspersions' " on defense counsel, and he implicated defense counsel in defendant's alleged dishonesty "because [defendant's] defense could only reach the jury through defense counsel's work."

Defendant's misconduct argument implicates the extent to which the prosecutor may comment on both the defense attorney's trial conduct, and the credibility of a defendant's trial testimony. We begin with a series of cases which address the permissible extent of prosecutorial comments on defense counsel.

"A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel. [Citations.]" (*People v. Hill* (1998) 17 Cal.4th 800, 832.) "[I]t [is] improper for the prosecutor to imply that defense counsel has fabricated evidence or otherwise to portray defense counsel as the villain in the case. It is not necessary to find that such implication impinges upon defendant's constitutional right to counsel. [Citation.] Instead it is sufficient to note that defendant's conviction should rest on the evidence, not on derelictions of his counsel. [Citations.] Casting uncalled for aspersions on defense counsel directs attention to largely irrelevant matters and does not

constitute comment on the evidence or argument as to inferences to be drawn therefrom.' [Citation.]" (*People v. Sandoval* (1992) 4 Cal.4th 155, 183–184.)

"In addressing a claim of prosecutorial misconduct that is based on the denigration of opposing counsel, we view the prosecutor's comments in relation to the remarks of defense counsel, and inquire whether the former constitutes a fair response to the latter. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 978, overruled on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

There are numerous cases that have rejected misconduct claims based upon closing arguments far more inflammatory than anything said in this case. For example, in *People v. Cummings* (1993) 4 Cal.4th 1233 (*Cummings*), the court found the prosecutor did not commit misconduct when he argued that " 'a skillful lawyer, a lawyer that is persuasive as [defense counsel] is, could maybe get [a witness] to say almost anything ….' " (*Id.* at p. 1303.) *Cummings* held such an argument was a comment on that witness's confusion and difficulty in understanding and responding to questions, rather than an assertion that defense counsel sought to elicit perjured testimony from the witness. (*Ibid.;* see also *People v. Marquez* (1992) 1 Cal.4th 553, 575–576 [prosecutor's reference to defense as "smokescreen" not misconduct]; *People v. Young* (2005) 34 Cal.4th 1149, 1193 [prosecutor's characterization of defense counsel's argument as " 'idiocy' " was fair comment on counsel's argument]; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1154 (overruled on another point in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22) [prosecutor did not commit misconduct and "simply used pungent language" when he described defense counsel's closing argument "as a 'lawyer's game' "]; *People v. Stitely* (2005) 35 Cal.4th 514, 559–560 [prosecutor did not commit misconduct by arguing jurors should avoid " 'fall[ing] for' " defense counsel's " 'ridiculous' " and " 'outrageous' " attempt to allow defendant to " 'walk' free" by claiming he was guilty only of second degree murder]; *People v. Gionis* (1995) 9 Cal.4th 1196, 1215–1216 ... [prosecutor did not commit misconduct by arguing defense counsel

was talking out of both sides of his mouth and that this was " 'great lawyering' "]; *People v. Bell* (1989) 49 Cal.3d 502, 538 [not misconduct when prosecutor argued defense counsel's job was to " 'confuse []' " and " 'throw sand in your eyes,' " and that counsel " 'does a good job of it' "].)

In addition to fair commentary about defense counsel's handling of the case, "[t]he prosecutor is permitted to urge, in colorful terms, that defense witnesses are not entitled to credence, to comment on failure to produce logical evidence, to argue on the basis of inference from the evidence that a defense is fabricated, and to comment on the evidence of prior convictions attributable to defense witnesses. [Citations.]" (*People v. Pinholster* (1992) 1 Cal.4th 865, 948 (*Pinholster*), overruled on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459.) In *Pinholster*, the prosecutor did not commit misconduct when he referred to a defense witness as a " 'weasel,' " called another defense witness a "perjurer," accused yet another witness of failing to follow the defense " 'script,' " and said defendant had been "caught in some lies, some 'doozies ….' " (*Pinholster*, *supra*, at p. 948.) In *People v. Boyette* (2002) 29 Cal.4th 381, the court held the prosecutor did not commit misconduct by repeatedly calling defendant "a liar." (*Id*. at p. 433.) The court held it was permissible argument since there was conflicting evidence about certain issues which the prosecutor argued defendant lied about, and "the prosecutor was thus permitted to argue that defendant was less than truthful." (*Ibid*.)

In *People v. Edelbacher* (1989) 47 Cal.3d 983, the court held the prosecutor did not commit misconduct by describing defendant as, among other things, "a 'pathological liar,' and 'one of the greatest liars in the history of Fresno County.' " (*Id*. at p. 1030.) "Referring to the testimony and out-of-court statements of a defendant as 'lies' is an acceptable practice so long as the prosecutor argues inferences based on evidence rather than the prosecutor's personal belief resulting from personal experience or from evidence outside the record. [Citations.] Argument may be vigorous and may include opprobrious epithets reasonably warranted by the evidence. [Citations.] The prosecutor's comments

were based on the evidence and amounted to no more than vigorous but fair argument." (*Ibid.*)

### 1. **Analysis**

As illustrated by the cases discussed *ante,* the prosecutor's rebuttal argument in this case did not constitute misconduct, and he did not improperly demean or denigrate the integrity of defense counsel, the defense strategy, or the defendant. Both the prosecutor and defense counsel agreed the disputed issue was the gunman's identity. The prosecutor argued the eyewitness identifications, Vang's testimony, and the evidence about the gun proved defendant was the gunman. Defense counsel argued the police failed to follow other leads in the case, Jerry Jr.'s statement influenced the police to decide defendant was the gunman, and disputed the testimony from the victims and Vang based on defendant's trial testimony about their own motives.

Defendant argues there was no evidentiary support for the prosecutor's argument. To the contrary, the prosecutor's rebuttal was based on inferences arising from defendant's own testimony and a fair comment on the evidence. During defendant's direct examination, defendant testified he had never seen the cell phone photograph of the gun before he was arrested. As background for that question, defense counsel asked him to look at the exhibits which were photographs from Jackson's cell phone, and whether he had been "able to review police reports and photographs provided by the District Attorney." Defendant said yes. Counsel asked how he was able to do so. Defendant replied, "You came to see me and went over them with me." When defendant was asked whether he remembered his prior statement to Detective Castillo, he testified he reviewed the transcript of his postarrest statement. On cross-examination, defendant further testified he reviewed the transcript of his call to Jackson from the jail, the police reports about all the statements from the witnesses, the victims' testimony at the preliminary hearing, and heard the testimony of all the witnesses at trial.

41.

In this case, "[t]he prosecutor's comments on [the] defensive tactics were supported by evidence in the record, some of it provided by [defendant] himself. [Citation.] Comments concerning [his] bias and motive for lying were not improper." (*People v. Jenkins* (1974) 40 Cal.App.3d 1054, 1057.)

Having found the prosecutor did not commit misconduct, and that his argument was supported by evidentiary inferences, we further reject defendant's claim that the rebuttal argument violated his constitutional rights to present a defense, testify on his own behalf, and to be present at all critical stages of trial. The prosecutor did not accuse defendant and his defense counsel of conspiring to fabricate a defense or falsify evidence. Instead, the prosecutor argued defendant's testimony was not credible, he was lying about his actions that night, and he had the opportunity to mold his testimony to fit the evidence he had already heard.

## III. Prosecutorial Misconduct – Alleged Misstatement of the Burden of Proof

Defendant raises another claim of prosecutorial misconduct during rebuttal argument, and asserts the prosecutor "incorrectly stated the role of circumstantial evidence in proving the elements of an offense, shifted the burden of proof to the defense, and lessened his own burden of proof." In making this argument, defendant raises the curious claim that the prosecutor was legally obliged to prove the elements of the charged offenses "by substantial evidence." Defendant contends the court erroneously overruled his objections to the prosecutor's allegedly prejudicial misconduct.

In order to evaluate these contentions, we will review relevant portions of the parties' closing arguments and then turn to defendant's assignments of error in the rebuttal argument.

### A. *Prosecutorial Misconduct and the Burden of Proof*

It is well settled that while a prosecutor has broad discretion to discuss the legal and factual merits of the case, it is improper to misstate the law, and "it is misconduct for counsel to attempt to absolve the prosecution from its prima facie obligation to overcome

42.

reasonable doubt on all elements. [Citation.]" (*People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1266.) A prosecutor must refrain from misstating the law or impermissibly seeking to shift the burden of proof to a criminal defendant. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339.)

"Comments on the state of the evidence or on the defense's failure to call logical witnesses, introduce material evidence, or rebut the People's case are generally permissible. [Citation.] However, a prosecutor may not suggest that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' [Citations.]" (*People v. Woods* (2006) 146 Cal.App.4th 106, 112.) "A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*People v. Bradford, supra,* 15 Cal.4th at p. 1340.)

### B. The Prosecutor's Closing Argument

The prosecutor discussed elements of the charged offenses and argued "there's only one real question you need to answer in this case: Who did it? … So it is important that you understand these elements, because it is the law. But really the focus of these elements is the person who did it. [¶] But at any rate, the People must prove each of these elements beyond a reasonable doubt." "[T]hese are the elements, this is what must be proven. What you must decide is was it the defendant. That is the only question."

The prosecutor advised the jury that it had to consider all the evidence, which shows that "[s]omeone is lying, someone is telling the truth. Your role, not the judge's, not mine, not the defense attorney, your role is to decide what the truth is. That is your role. And I submit to you that the truth, combined with a lie, does not equal reasonable doubt.… You can consider the lie, but that does not mean that you must accept the lie. When the full weight of the evidence points in one direction, but you are told to consider something else, that does not mean that you must accept it. That is your role."

The prosecutor argued the jury could find defendant guilty based on Vang's testimony about what defendant said on the night of the shooting, his postarrest call to Jackson to get rid of the cell phone, the photograph of the gun on the cell phone, and the expert's comparison of the expended shells found at the victims' house with the type of gun depicted in that photograph.

### C. Defense Counsel's Closing Argument

Defense counsel agreed the case was about "identification," and addressed the People's burden of proof:

> "[The case] is about whether or not you have been presented enough information to decide whether or not [defendant] is the individual that committed this crime. Now, you can look at it from the perspective of, well, which party presented that to me in the best light. That would be incorrect, however. *To place the burden on [defendant] and I'd have to explain to you that he was not the individual involved is not accurate. It is not part of the law. The burden rests solely on the People to prove beyond a reasonable doubt that [defendant] is the individual that committed this crime*." (Italics added.)

Defense counsel asserted the police should have followed different leads and conducted a more thorough investigation about the gunman's identity instead of relying on Jerry Jr.'s statements.

> "*And remember, I do not have to prove any of these theories*. I don't have to say, this is the suggestion, and you look and say, well, I don't believe what [defense counsel] says so now I have to convict. These are just suggestions. *Remember, as the judge explained to you, I don't have to do anything. I'm not going to do that. As you say, I was clearly going to question people. I was clearly going to question the evidence*." (Italics added.)

Defense counsel argued Vang lied to the police about everything, including the nature of her relationship with defendant, the incident at the mall, whether she learned about the shooting on Facebook, what defendant said and did that night, and whether defendant asked her for an alibi. Counsel again returned to the argument that the police failed to investigate other leads in the case.

"Which leads, you might say. *Remember, the burden is not on me.* But I want to suggest as much as I can for you, so you can get a better picture. I'm not a detective. I'm not a police officer. It is not my job to investigate this crime. It is my job to advocate Anthony's position." (Italics added.)

Defense counsel argued the officers never obtained Jerry Jr.'s cell phone records to find out who he was texting just before the shooting; they never tried to determine whether the shooting had anything to do with the pending case against Jerry Jr.; they did not investigate why Jerry Jr. kept changing his story about the gunman's mask; they failed to further investigate the suspects who were detained the night of the shooting simply because Lezette did not identify them; and they failed to follow up on the mixture of DNA found on Jerry Jr.'s wallet.

Defense counsel concluded:

"[The prosecutor] has to prove every single fact. It is the District Attorney that has to disprove everything that I'm telling you. *I don't have to prove that Anthony was Facebooking. He has to disprove that he wasn't. I don't have to prove that he didn't commit this crime. The People have to prove that he did.*" (Italics added.)

### D. The Prosecutor's Rebuttal

Defendant's claims of misconduct are based on the following italicized sections of the prosecutor's rebuttal argument.

The prosecutor acknowledged defense counsel's suggestion that the police failed to fully investigate the case, and argued that it was not unusual to have minor inconsistencies when witnesses describe a traumatic event such as the attempted murders in this case.

The prosecutor continued:

"It is important to recall what I do not have to prove beyond a reasonable doubt. Because there was some suggestion by the Defense what I have to prove. *What I have to prove is exactly what the judge told you I have to prove: The elements of Counts One through Four and the*

45.

*enhancements.  Those slides that I showed, the law that you have, that is it. That is it*." (Italics added.)

Defense counsel objected.  The court overruled the objection.  The prosecutor continued:

"*I do not have to prove beyond a reasonable doubt whether the defendant did or did not go to the Fresno Police Department.  Maybe he did*.  Maybe a clerk absolutely screwed up and told someone that wanted to turn themselves in for a shooting or answer questions about a shooting and shooed them out the door.  I don't have to prove whether that did nor did not happen.  That is not the elements.  That is not the law.  *I do not have to prove beyond a reasonable doubt whether the defendant did or did not have a mask or whether he did take it on and off in the timeline*.  I don't have to prove that beyond a reasonable doubt.  What I have to prove beyond a reasonable doubt is strictly the elements*." (Italics added.)

Defense counsel again objected.  The court asked the parties to approach and it conducted an unreported conference with the attorneys.  After the conference, the prosecutor resumed.

"*I do not have to prove beyond a reasonable doubt whether the defendant did or did not date Gabby*.  I mean, these are all questions that maybe … can't be answered, that you may have opinions on.  That is fine.  But the obligations of the People should be very clear, what I have to prove beyond a reasonable doubt.  *And I don't have to prove beyond a reasonable doubt that the victim's or the defendant's DNA was on the wallet.  Only the elements of the crimes charged*." (Italics added.)

The prosecutor concluded with a legally correct discussion of reasonable doubt based on the jury instruction.

### E.  Burden of Proof

Defendant cites the italicized sections of the prosecutor's rebuttal argument, as quoted above, and argues the prosecutor committed misconduct by shifting the burden of proof on issues for which the defense tried to create a reasonable doubt, and misleading the jury to believe defendant had the burden of proving his innocence.

However, the prosecutor's rebuttal argument was legally correct when he stated the People had the burden of proving "[t]he elements of Counts One through Four and the

46.

enhancements."  The court properly overruled defendant's objections to this argument. In addition, the prosecutor did not shift the burden of proof when he argued that he did not have to prove issues such as whether Vang was on Facebook on the night of the shooting, that defendant tried to talk to someone at the police department, or if the gunman was wearing a mask.  While the People had the burden of proving each element of the offense beyond a reasonable doubt, the prosecutor did not say that the People did not have to prove the gunman's identity.  Instead, the prosecutor used rebuttal argument to respond to defense counsel's assertions about peripheral issues in the case which addressed the credibility of some of the witnesses and not the elements of the offenses.

### F.  The People's Burden at Trial

Defendant further asserts the prosecutor misled the jury by allegedly arguing "his only duty was to prove 'the elements' of the offense beyond a reasonable doubt," and he improperly "disavowed his duty *to prove those elements by 'substantial evidence.'* " (Italics added.)  Defendant claims:

> "But [the prosecutor] was incorrect.  It is hornbook law that to sustain a conviction, there must be substantial evidence on each of the essential elements of the crime….  [The prosecutor's] claim that he had only to prove the elements of the charged offense was not accurate.  *He had to prove those elements by substantial evidence*."  (Italics added.)

In response to defendant's appellate arguments on this point, the People have replied that defendant confused the distinction between the People's burden to convict a defendant at trial, and the proof necessary to affirm a conviction on appeal.  In his reply brief, defendant again declared the prosecutor's rebuttal argument was misleading because there is "no dual standard under the due process clause for criminal convictions. *Proof beyond a reasonable doubt means substantial evidence exists on each of the essential elements of the crime.  This standard applies in the trial court, and it applies in the court of appeal*."

47.

We are compelled to address defendant's erroneous description of reasonable doubt and substantial evidence. "The Fourteenth Amendment of the United States Constitution provides that the state shall not deprive a person of his liberty without due process of law. In the context of a criminal trial, due process requires proof beyond a reasonable doubt. *A trial court, therefore, must instruct the jury that, before reaching a guilty verdict on the criminal charge, the prosecution must prove every required element beyond a reasonable doubt*." (*People v. Beeson* (2002) 99 Cal.App.4th 1393, 1401, fns. omitted; *In re Winship* (1970) 397 U.S. 358, 364; *Arizona v. Fulminante* (1991) 499 U.S. 279, 291.)

It is the prosecution's burden in a criminal trial to prove every element of the crime, including the identity of the perpetrator, beyond a reasonable doubt. (*People v. Cuevas* (1995) 12 Cal.4th 252, 260; *People v. Berryman* (1993) 6 Cal.4th 1048, 1083, overruled on another ground in *People v. Hill, supra*, 17 Cal.4th 800, 823, fn. 1.) "California law imposes a duty on the trial court to instruct the jury in a criminal case on the presumption of innocence in favor of the defendant and the prosecution's burden of proving guilt beyond reasonable doubt." (*People v. Aranda* (2012) 55 Cal.4th 342, 352.) CALCRIM No. 220, which we will quote *post*, correctly instructs the jury about the People's burden of proving the elements of the offense beyond a reasonable doubt, and the definition of reasonable doubt. (*Ibid*.)

In contrast, the substantial evidence standard of review applies "when an appellate court is reviewing on appeal the sufficiency of the evidence to support a conviction …." (*People v. Cuevas, supra*, 12 Cal.4th at p. 261.)

> "In assessing a claim of insufficiency of evidence, *the reviewing court's task* is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence

48.

*entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.* [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11, italics added.)

" 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], *it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt.* " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' [Citation.]" (*People v. Stanley* (1995) 10 Cal.4th 764, 792–793, italics added.)

Contrary to defendant's appellate contentions, the prosecutor did not misstate the People's burden of proof. Indeed, the prosecutor would have committed error if he made the type of argument suggested by defendant: that the People were only required to prove the elements of the charged offenses by "substantial evidence."

### G. Direct and Circumstantial Evidence

Finally, defendant argues the prosecutor committed misconduct because his rebuttal argument misled the jury about its consideration of circumstantial evidence to convict him. Defendant argues that since substantial evidence may be either direct or circumstantial, and the witnesses other than Jerry Jr. only offered circumstantial evidence of the gunman's identity, the prosecutor "could not convict [defendant] unless he proved both direct and circumstantial evidence beyond a reasonable doubt. His statement that he had only to prove the elements of the offense was wrong and misleading."

We have already explained that defendant's argument is based on the false premise that the People's burden of proof was based on the "substantial evidence"

standard. Defendant has not challenged the instructions given in this case, which are contrary to his version of the People's burden of proof. The prosecutor's rebuttal argument was consistent with these legally correct instructions. For example, the jury was instructed pursuant to CALCRIM No. 223 that "[f]acts may be proved by direct or circumstantial evidence or by a combination of both."

> "Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge, including intent and mental state and acts necessary to a conviction, and neither is necessarily more reliable than the other. Neither is entitled to any greater weight than the other. *You must decide whether a fact in issue has been proved based on all the evidence*." (CALCRIM No. 223, italics added.)

The jury received CALCRIM No. 224, that before it could rely on circumstantial evidence "to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that *the People have proved each fact essential to that conclusion beyond a reasonable doubt*." (Italics added.)

As to the elements of the charged offenses, the jury was instructed that to prove defendant guilty of attempted murder, robbery, and discharge of a firearm, the People must prove defendant committed the delineated statutory elements, which included the elements that defendant was the person who committed the crimes. (CALCRIM Nos. 600, 965, 1600.)

Finally, the jury was instructed with CALCRIM No. 220 on the burden of proof:

> "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial.

> "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.

> "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate

50.

all possible doubt because everything in life is open to some possible or imaginary doubt.

"In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

These instructions correctly state the relevant legal principles, defendant has not challenged the instructions, and the prosecutor's rebuttal argument did not run afoul of these instructions.

## IV.    Substantial Evidence of Attempted Murder

Defendant contends his convictions must be reversed because the evidence did not prove he was the gunman "beyond a reasonable doubt."

Given the nature of defendant's arguments, we again state the applicable standard of review on appeal. "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]" (*People v. Rodriguez*, *supra*, 20 Cal.4th at p. 11.)

51.

"The standard of appellate review is the same in cases in which the People rely primarily on circumstantial evidence. [Citation.] Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.] 'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove [her] guilt beyond a reasonable doubt.' [Citation.]" (*People v. Bean* (1988) 46 Cal.3d 919, 932–933; *People v. Stanley*, *supra*, 10 Cal.4th at pp. 792–793.)

The evidence against defendant was overwhelming. Defendant was not a stranger to the victims and witnesses in this case. He was a long-time friend of Jerry Jr., his parents, and brothers. He often visited the Manning house. When Jerry Jr. was shot and stumbled to the front door, he immediately told his parents and his brother that defendant shot him. Jerry Jr. said the gunman was not wearing a mask. Jerry Sr. said the gunman was wearing a mask, which was not inconsistent with Jerry Jr.'s statement since defendant had time to pull the mask over his face. After Jerry Sr. was repeatedly shot, the gunman went into the house, found Jerry Jr. in the kitchen, placed the gun at his head, and said that he was going to kill him. Jerry Sr. testified he heard the threat and recognized defendant's voice. As Jerkobe walked home from the bus stop, he recognized defendant running away from his house with another man. Jerkobe told the police that defendant said he had just shot someone, and he was putting a black and white mask in his pocket as he ran away. When the police arrived at the house, Jerry Sr. was unable to respond to questions, but Jerry Jr. said defendant shot him. Lezette told the officers that after Jerry Jr. was shot, he told her that " 'Ant did this,' " and she believed he meant defendant. Jebril also described what had happened. While the victims may have

hesitated about cooperating with the investigation, they later gave full statements about the shooting which were consistent with the details already given by Lezette and Jebril immediately after the shooting.

Moreover, this case did not rest on the testimony of the Manning family. As noted above, Gabrielle Vang's testimony was extremely damaging to the defense because she described defendant's inculpatory statements and actions in the hours after the shooting. In addition, defendant's jailhouse call to Jackson was recorded, and revealed his order to get rid of the cell phone. The police obtained a search warrant for the cell phone and discovered the photograph of the weapon, which matched the expended cartridges found at the scene.

Defendant asserts the "sheer number of witnesses" who identified him as the gunman was not "proof beyond a reasonable doubt," and "[e]veryone's belief" that he was the gunman derived from the incorrect assumption that Jerry Jr. was telling the truth when he said defendant shot him. Defendant argues the Manning family's claims that he was the gunman were based on their unreliable assumption that Jerry Jr. was telling the truth. Defendant declares the victims "wanted" him convicted, and they "came up with details long after the event to bolster" the chances of getting a conviction. Defendant further argues Vang had a motive to lie against defendant, and the cell phone photograph of the gun was inconclusive.

Defendant raised these issues before the jury. As we explained in issue I, *ante*, defense counsel was faced with a difficult task in light of the overwhelming prosecution evidence, but endeavored to show how the victims delayed reporting the details about the shooting, tried to impeach Vang's credibility because of her apparent anger at defendant, and also tried to explain defendant's order for Jackson to get rid of the cell phone. These were issues placed before the jury, the jury obviously rejected the attacks on the credibility of the victims, witnesses, and Vang, and defendant's convictions are supported by substantial evidence.

53.

## V.    Correction of Abstract

The parties agree the abstract of judgment incorrectly states defendant was convicted in counts I and II of "attempt 2nd deg murder."  A conviction for attempted murder is not divided into degrees.  (*People v. Favor* (2012) 54 Cal.4th 868, 876.)  The abstract of judgment must be corrected to state defendant was convicted in counts I and II of attempted murder, and not attempted second degree murder.

## DISPOSITION

The superior court is directed to correct the abstract of judgment to state defendant was convicted in counts I and II of attempted murder and not attempted second degree murder.  The superior court is further directed to transmit certified copies of the amended abstract to all appropriate parties and entities.  In all other respects, the judgment is affirmed.

_____
Poochigian, Acting P.J.

WE CONCUR:


_____
Franson, J.


_____
Peña, J.